Good morning, members of the court. My name is Sue Ellen Tatter and I represent Dean Bower, the appellant who was convicted after agents entered his home with a search warrant and seized child pornography. This court in Gord Basically, why this is any different than Gord? Pardon? Just address why and whether there are any factors here that are different than Gord in any way that matters. Yes, there are some important factors different than Gord. Why did you wrap your arms around Gord in your opening brief and set out that lovely chart trying to convince us to just the opposite? Well, I think we certainly would have prevailed if the panel decision were still good law. The question is, what's left after Gord 2? And I don't understand how you can now suddenly say, well, the in-bank opinion in Gord 2 came down after I wrote my opening brief, you know, bad luck for Mr. Bower. But having taken the position in your opening brief that you're wrapping yourself like a blanket with Gord 1 and then to stand before us and say, oops, Kings X, it really isn't applicable. I'm all ears. Okay. The first distinction is that Gord didn't really challenge the nexus to the home. Or if it did, that wasn't part of the panel decision or the en banc decision. In this case, there's no common sense reason to believe that Mr. Bower had a computer in his home. They didn't have, like in Hay and Lacey, direct contact with a computer that was downloading child pornography. They had no idea if he had a computer. He could have used Internet sites at cafes. He could have had a laptop like your honor that goes from place to place. It could have been in his car. But wasn't there an issue that he was, A, living there, he was paying with a credit card, that the bills were being sent to that address? Basically, where else would they look for it? The bills went to a post office box. They did connect Mr. Bower with the home. But they didn't connect him with any computer. And look at the dates that we're talking about. And I'm not saying the warrant was stale. But we're talking about a website or three websites that got closed down in spring of 2003. The agents went to his home in April 2004. Now, most people get new computers. They change their software. If you're looking at common sense behavior of how people deal with computers, they go to Internet cafes. They change their software. They don't... You know, I don't know that much about Internet cafes, I must admit. But if... I don't want to put this hypothetical in a delicate way. But if I were going to view something on a computer screen that was in any way sensitive, let's put it that way, if I were looking at a secret document or something that was illegal or anything of that sort, I wouldn't do it in a public place like an Internet cafe. I wouldn't do it at work. And I don't think you would. I mean, I think most people wouldn't. You find someplace really private where somebody can't look over your shoulder and either read what you are reading or view the pictures that you are viewing or anything of that sort. And the home seems like the most likely place. Except that I don't think that's true. I think every time I've gone to an Internet cafe and gotten online to check my email, I'm aghast at the previous sites. I think people access pornography all the time in Internet cafes. They also carry it on laptops. And I think that makes a lot more sense from car to work. Now, the affidavit did address this in generic terms. It said generically that people usually look at pornography in private places and so on. Is that adequate? I don't think the child pornography collector profile is entitled to much weight at all without any connection that Mr. Bauer is a child pornography collector. In Lacey, this Court's opinion, they had him actually downloading child pornography. So this Court said that's okay now to view him as a collector because we know he downloaded it. But that's a very hard thing to catch somebody in the act of doing. It is in the nature of the business that people do these things in secret. You're not going to be able to look over their shoulders and see them downloading something. You know, it seems to me you have to come up with a position that's both permissible under Gordon 2, you know, not within the sort of fair implication of what McKillop's opinion says there, but also that presents a tractable problem for law enforcement. You can't ask them to read minds. You can't ask them to look through walls. How are they going to catch somebody downloading? If you limit warrants to situations where they actually catch somebody in the act of downloading, I don't think it would be possible to get very many warrants. Well, I think you can make sure someone has a home computer, and you can do that by credit card bills. If they're looking at his credit card bill for what he joined the website for and his subscriptions, you can see if he went to Costco and – You know, we don't anymore wonder whether people have refrigerators or televisions. And I don't know. I mean, computers now seem so common that they're almost like a refrigerator or a television set. Can't law enforcement have – you know, the test is a fair influence. I think the search warrant connected Mr. Bauer to the home. I don't dispute that. But there was no indication of a computer. And in this court's previous cases, there was. There were no bills showing a DSL or broadband connection or anything of that sort? No. I mean, there's nothing here like that. There's no bill to – or GCI or ASC or utility companies. Of course, if he used a dial-up connection, you wouldn't have that. Well, there's no indication that his phone was connected to the computer, that there was a modem. It's just absent. But you wouldn't be able to tell that, would you, Ms. Tatter? How would the agents prove that? In the other cases, including Gord, the government went to the website. They took down the companies. They closed them down. They looked at their bill. And then they looked at their activity. And, in fact, in Gord – The whole point in Gord was that they didn't put that in the affidavit. And in Gord, there's no actual indication that they knew he had a computer. Is that right? Right. But they did – It wasn't discussed, but there was no indication. Right. Well, they did go to the director of the site, and the site director in Gord admitted that he was running a child pornography site. That's a completely different question. That doesn't have to do with this question of whether Gord – Right. To get back to Judge Kaczynski's question, what makes these cases different from the drug trafficking cases where we have had very little difficulty assuming a connection with incriminating evidence at the home of a drug dealer on the assumption that the affidavit establishes probable cause that he's engaged in dealing drugs? Because the connection here is not just for general home activity. It's for a very specific machine that has connections, that's traceable, that costs a lot of money, that people change out every six or eight months. Why isn't there a fair probability that the conduct that he's accused of engaging in is being conducted in a more private location, such as his home, than in any other place where he might take a laptop computer? Because this case, the affidavit has nothing about his computer activity, and I don't think there's any other case like it where there's no indication of a computer. Well, Gord, as far as you can tell from facts, he can't. Well, there's another important distinction. Well, I'm sorry. He did join these sites. I suppose it's possible to join Internet sites without having a computer because you want to donate money to them or something of that sort. But isn't it a fair inference that if you are billed for joining an Internet site, some sort of Internet website that you have a computer somewhere, that you don't just buy subscriptions for no reason at all? I think millions of young people join music websites and access them in cafes or their employer's computer and pay money to join the website without owning a computer. They want the access to the music, but they don't want to pay for a computer, and there's many computers to use. All you need are your passwords. But there's another distinction with Gord that I would just like to mention. The websites that are described in Gord are very detailed in the description. There's testimonials. There's description of what was to be seen on the home page. I'd like to cite the agent's affidavit here at pages 20 and 27. They're a very bland description. Now, it is true when the agents went in, they chose to describe for the magistrate certain salacious pictures that they saw. But the websites were home page, minor girls in various states of undress. And on page 20, the agent said, well, we picked those websites that had, quote, actionable images, unquote. That's a lot different than the Gord detailed website that said, come on in, here's what we've got, and then had testimonials and descriptions of what they had. Well, what about the name of the website? Can't the magistrate look at www.loletals.com and conclude that that might be offered to somebody who's looking for child pornography? I think that's true, and I think that there was child pornography on this, and I think that that's part of the story. But that doesn't mean this is 100% or even 50% child pornography. But Gord did say specifically that it was a mixed site, and that was part of the 40%. Yes. So that doesn't seem to be a distinction, because that was a mixed site. That's true. However, I think this is a lot less detailed and very bland compared to the Gord website descriptions. Thank you. I'd like to reserve a little time if I could. Good morning. My name is Audrey Wrenchon. I'm the Assistant United States Attorney here in Anchorage, and I was both the trial counsel and the appellate counsel. This case is different from Gord 2, but it's different in a way that I think makes the probable cause finding here more solid. You may remember in Gord that it was a mixed site. It included images of adult pornography as well as child pornography. Secondly, it contained a banner that said that the site was in full compliance with the law. There's no evidence in this case that there was any kind of a banner that said that this was a lawful site. And third, this was a case that involved three separate subscriptions over a period of almost five months, and the cost for each of those subscriptions was upward from $50 versus the $19. What about the delay point that the appellate counsel raises? The sites were shut down one year in April, and he wasn't actually served with a warrant until about a year later. From a practical perspective, when a national investigation is discovered, there are attempts to get lead information out to- The question is whether there remained probable cause. First of all, what probable cause there was to begin with as to him having the computer in the house? And second of all, what probable cause there was that he still had the same computer in the house a year later? Well, the question of staleness or the issue of staleness was never raised. It's not exactly a question of staleness. It's a question of why they thought they were going to find a computer in his house with these images on it at the time they went in to look for it. And I guess in that regard, the question of him having a computer in his home and what's being called the staleness issue are similar, because that information is drawn through inference from what the experts tell us about people who collect and download child biography. What do they say on this issue? Specifically, and this is at page 62 of the excerpt labeled A, and the 62 is in the lower right-hand corner. It would be page 32 and 33, 62-63 of the actual search warrant itself. And there, the officer speaks of three things that are typical of people who collect child pornography. This is A, B, and C here on page 62? A, B, C, and also D, E, F. The salient points are that the people keep the materials in the privacy and security of their home or another secure place. The second point is they keep it close by so that they can access it at any time. And third, they keep it for a long time. And that's a theme that is spoken about in Gord as well. What does it say long time? That is in paragraph C. Child pornography collectors typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years. Also in paragraph D, in speaking of digital images, the lessons. This includes a lot. Pictures, films, photographs, negatives, magazines, books, tape recordings, mailing lists, child erotica, and videotapes. What isn't here in our list is computer images. I'm sorry. I couldn't hear the last part. What is not included in this list is computer images. If you look at the next paragraph, it's there, Your Honor. Okay. I was just looking at what you read to me. I was going to read the next part to you about the digital. Maybe you could have read me that next part first. You're right. This one doesn't have anything to do with my question.  Let's read the next thing. Paragraph D speaks of digital images that are kept in safe, secure, and private environments. And the last sentence of that paragraph, these collections are often maintained for several years and are kept close by, usually at the collector's residence, to enable the collector to view the collection, which is valued highly. As I understand your opponent's response to that, it's, well, that's all fine and good, but first you have to prove his, or at least first you have to have some probable cause to believe he was a collector. Is that issue essentially resolved by court? Is that what your position would be? Yes, and I think emphatically under the facts of this case with the three separate subscriptions. Mr. Brower was not an accidental browser. Well, he was a viewer. The question is whether he was a collector. I mean, I certainly can infer that he was a viewer. No doubt about that. But there's some circularity to the question of whether he's a collector if you don't know whether he had a computer. Well, I think from a common sense standpoint, people who are just accidental browsers or viewers wouldn't necessarily go out and pay money to get images. The Internet is a huge source of information. A person can Google the term child pornography and come up with bazillions of pieces of. . . Well, I think you're looking at addressing the wrong question. He may, in fact, be interested in child pornography. He may, in fact, like to look at child pornography. He might be willing to pay to see child pornography. But I think what Judge Verzone was asking, if I understood correctly the question, is these are indications that he collects such images. I mean, I like to look at art, for example. I sometimes go online and I look at museum collections. If I can't actually go down to a museum or something, I look and see what's showing in a museum in Barcelona or Paris or something like that and enjoy it. But, you know, I don't download to my computer because, you know, what's the point of having a computer image of, you know, the Mona Lisa or something? It just doesn't interest me. I'm not that kind of collector. So I think what I heard Judge Verzone asking, and it's certainly the question that interests me, is does the fact that he pays to view these images necessarily make him a collector, somebody who would actually pull images down and store them on his computer and keep them for many years? I think that there's a distinction to be made between the kind of collector who collects art and the kind of collector who collects child pornography. I understand. There is obviously a distinction. I was just going to use an example. Are you saying that somebody who views pornography is necessarily somebody who will hoard it? I think that a person who pays a lot of money over a long period of time so that he can access child pornography is likely to be a collector of child pornography. How do we know that? It's true that the officer in his affidavit did not explicitly state, I believe this person is a collector, but I think that there's a common sense inference that you can draw from that conduct. In any event, it's an inference somebody has to draw. It is. And I think the full question that Judge Berzon asked you, does Gord fill in that inference? I think it does. I think Gord says that even a single subscription to such a website is enough to believe that there will be probable cause to find child pornography. And keep in mind, this is kind of peculiar, but although Gord doesn't explain why they were assuming all the way through that he actually did have a computer in his house, all the way through it, the assumption that it was downloaded depends upon their having a computer. I mean, the notion is, well, why would he have a computer in his house and subscribe and download and then not keep the stuff, or not download. But there's an assumption, unarticulated about where it comes from, that there was, in fact, a computer at his house. And that's the basis on which they drew the inference that he was a collector. Yes. And that inference is here as well. As Judge Kuczynski said earlier, this kind of sensitive material is not something that is typically viewed on the Internet. It's not the kind of thing that you would say to your neighbor, hey, do you mind if I come over to your house this afternoon? I want to check out some child pornography websites. It's not the kind of thing that you would do at your office. Offices are routinely now trying to intervene to make sure that people don't access the Internet for purposes other than their work. And I would point out that there's a huge difference between accessing a paid-to-view child pornography site than to check the Internet for baseball scores. That's a qualitative difference. And Mr. Bauer made very clear that he was willing to pay for child pornography. What if it's a paid-to-view baseball scores? I don't know much about baseball scores. I don't know about Internet cafes. But there are websites that calculate the odds of games, I believe. Not for betting purposes, because people have these virtual games or something. But people actually do take the money to figure out what the odds are of various games, right? You think that would be different, too? I do, because the person there is just trying to get the information about scores, about statistics. The person in the context of getting child pornography wants something different and does something different with that. It's not just gathering information. I would point out one other thing that I think is really salient, and that is that each of these websites, Low Littles, Dark Feeling, and BD Sisters, each of them throughout had in their preview page either pictures of child pornography or advertisements of child pornography. And once you became a member, each of them had child pornography on their sites. So this is very different from the Gord case, where there was a mixed site with adult and child pornography. So you're saying once you got into the members area of the website, is that what you're saying? I'm saying it was, this is what you're paying for, child pornography. We have child pornography, or we show you pictures of it. So there's no misunderstanding that there was an intentional purchase of child pornography in whose ever mind decided to subscribe to the sites. Thank you. I take it they found child pornography. I'm sorry? I take it they, in fact, found child pornography. They did, Your Honor. Okay. Thank you. You are out of time. We'll give you a minute for a bottle if you wish to take it. Two brief points, and thank you for the time. This affidavit didn't say what percentage of child pornography. It may have been a mixed site, and it didn't say whether or not there was a disclaimer. Under Gord it doesn't matter, right? Gord was a mixed site. Right. But I don't think it's fair to suggest that this was 100% child pornography. Clearly, even in the affidavit, some of it was child erotica, which is dressed people and things that are not pornography. But what I think the court's talking about and the prosecutor and me, we're all saying how people behave, how computers behave. What's common knowledge about how people function? And I think before we go into somebody's home to get a computer we don't know he has and get a search warrant to enter his private space, the government should be much more sure that there's a connection to the home rather than how child pornography collectors behave, how computers work. We don't have any real expertise or facts in this particular affidavit. Is it relevant that he had a prior conviction for sexual abuse of a minor and was at the time of the affidavit a registered sex offender? The magistrate didn't think so, and I agree with him, because it was very old. It was a very benign situation as those cases go, and we put in the transcript of the sentencing 11 or 12 years before. No, 15 years before, where it was a very old girl, and he was a very young man, and it just happened to be. . . They were both underage is what you're saying? No, but he was very slightly different, and he got a six-month sentence. It was a very benign situation, and it was more than 15 years old. But more than that, the issue that you're focusing on doesn't question that he was viewing child pornography. He was, so it isn't really relevant to the question of whether he liked to view child pornography. We know he liked to view child pornography. He had these subscriptions. The question is whether he collected it. Right. Was he a collector? And we're guessing how people function. We're guessing how computers behave. This stuff changes radically. Laptops come in. New technology comes in. Some people don't keep their computers for long. And I think before the court permits people to intervene in a home, it really needs better expertise. I don't think the fact that people don't keep computers for that long is all that helpful to you because, of course, you can take most of what's on a hard drive and put it on a zip drive or on a diskette or on a flash drive. It's very common to do backups. And if one were a collector of anything, images like that, what you do is to copy them to some hard medium. I assume that the warrants here cover hard mediums as far as computers themselves. If you were a collector, you might. But we're still guessing at how collectors behave and what agent laws said in his affidavit. You don't know where he got it. It could have been a bunch of agents talking at the break room about cases they've won and forgetting about all the cases where they didn't find child porn. So I think the court needs a lot more secure information. Thank you very much. The case is signed. It was case submitted.
judges: Kozinski, Berzon, Tallman